# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TINA MARIE SOMERLOTT )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>CHEROKEE NATION DISTRIBUTORS INC.,)<br>AN OKLAHOMA CORPORATION, AND )<br>CND, L.L.C., AN OKLAHOMA LIMITED )<br>LIABILITY COMPANY )<br>)<br>Defendants. ) | Case No. CIV-08-429-D |

## ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) [Doc. 38], which is supported by opening and reply briefs [Docs. 39,65] and Defendant's Notice of Supplemental Authority. [Doc.79]. Defendant alleges that Plaintiff's claims are barred by both tribal sovereign immunity and statutory tribal exclusions contained in both Title VII and the Age Discrimination in Employment Act ("ADEA"). Defendants' motion is opposed by Plaintiff's timely filed response brief [Doc. 64] and Plaintiff's Declaration of Tina Somerlott in Support of the Amended Complaint. [Doc. 80].

I. Background

Plaintiff brought this action for unlawful termination under Title VII and the ADEA against Cherokee Nation Distributors, Inc., now known as C.N.D., L.L.C ("CND"). CND is a limited liability corporation wholly owned by Cherokee Nation Businesses, Inc. which is

a corporation wholly owned and regulated by the Cherokee Nation, a federally recognized Indian tribe.

Plaintiff alleges that she was wrongfully terminated on January 5, 2007 as a result of her reporting of a sexual liaison in the workplace involving her immediate supervisor, Dr. Matthew Aguilar, ("Dr. Aguilar") and a hospital technician, Margaret Tiddark, on May 17, 2006. Plaintiff, a woman of over 40 years of age, contends her termination was motivated by discrimination based on her gender and/or age and the desire of her supervisor to punish her for her lawful objection to the hostile work environment created by his alleged sexual activities in the workplace. Plaintiff offers that Dr. Aguilar's submission of Ms. Tiddark for consideration as Plaintiff's replacement and the ultimate hiring of a younger replacement at substantially lower pay than Plaintiff was receiving is evidence of this discrimination. Plaintiff filed a grievance with the EEOC, which recommended settlement, but otherwise issued Plaintiff a right to sue letter on January 24, 2008.

Defendants' current motion to dismiss follows discovery by both parties. Defendant offers support that CND is entitled to tribal sovereign immunity from suit and is explicitly excluded from liability under Title VII and ADEA. This support includes an affidavit from the Secretary of CND outlining CND's business structure and relationship to the tribe (*see* Def. Br., Ex. "A", [Doc 39-2]), and a copy of an Act of the Cherokee Legislature which names CND as a subsidiary of Cherokee Nation Businesses, Inc., a corporation wholly owned by the Cherokee Nation and formed under Cherokee tribal law. *See* Def. Br., Ex. "B" [Doc. 39-3]. Plaintiff contends that CND is sufficiently attenuated from tribal government

2

so as not to be considered an "arm of the tribe" and, therefore, is neither protected by the tribe's sovereign immunity, nor entitled to the tribal exclusions from Title VII and ADEA. Plaintiff primarily relies on cases from other jurisdictions to support this contention.

II. Standard of Decision

Motions to dismiss for lack of subject matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *City of Albuquerque v. United States Department of Interior* 379 F. 3d 901, 906 (10th Cir. 2004) (citing *Ruiz v. McDonnell*, 299 F. 3d 1173, 1180 (10th Cir.2002)). If the motion challenges only the sufficiency of the jurisdiction allegations in the complaint, a court confines its review of the motion to the pleadings; the allegations in the complaint are accepted as true, and a court may not consider evidentiary material. *Holt v. United States*, 46 F. 3d 1000, 1002 (10th Cir. 1995). Where, however, the motion challenges the underlying factual basis for subject matter jurisdiction, the manner in which the motion is adjudicated differs. *Paper Workers International Union v. Continental Carbon Co.,* 428 F. 3d 1285, 1292-1293 (10th Cir. 2005) (citing *Holt,* 46 F. 3d at 1002-03). In such circumstances, a court must look beyond the complaint, and it has wide discretion to consider documentary and even testimonial evidence; it may consider such evidence without converting the motion to one seeking summary judgment. *Holt*, 46 F. 3d at 1002-03 (citing *Wheeler v. Hurdman*, 825 F.2d 257, 259 n. 5 (10th Cir.1987).

Under some circumstances, the court must convert a motion to dismiss to a motion for summary judgment. *Holt*, 46 F. 3d at 1003. Specifically, "a court is required to convert a Rule 12(b)(1) motion to dismiss when "resolution of the jurisdictional question is intertwined with the merits of the case." *Id.* The issues are considered intertwined for this purpose where "resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Pringle v. United States*, 208 F. 3d 1220, 1223 (10th Cir.2000).

The question of tribal sovereign immunity is a matter of subject matter jurisdiction which is properly challenged by a motion to dismiss under Fed. R. Civ. P. 12(b)(1). *See Miner Electric Inc. v. Muscogee (Creek) Nation,* 505 F.3d 1007, 1009 (10th Cir. 2007). In this case, Defendants' argument that tribal sovereign immunity precludes subject matter jurisdiction challenges the factual and legal basis for subject matter jurisdiction, rather than the sufficiency of the jurisdictional allegations in Plaintiff's complaint. Therefore, the Court looks beyond the four corners of the Amended Complaint and considers the parties' documentary evidence. Because resolution of this jurisdictional claim does not require examination of the elements of any of Plaintiff's claims, the motion may be determined without converting it to one for summary judgment.

III. Application

"It is well established that Indian tribes possess the common law immunity from suit traditionally enjoyed by sovereign powers." *Berrey v. Asarco, Inc*., 439 F. 3d 636, 643 (10th Cir.2006); *See Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc*., 523 U.S. 751, 754 (1998); *Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165, 172-73(1977). Tribal

4

sovereign immunity extends to subdivisions of the tribe. *Native American Distributing v. Seneca-Cayuga Tobacco Co.*, 546 F. 3d 1288, 1292 (10th Cir.2008). Absent explicit congressional abrogation or an express waiver by an Indian tribe, sovereign immunity deprives the federal courts of jurisdiction to entertain lawsuits against an Indian tribe, its subdivisions, or its officials acting in their official capacities. *See Native American Distributing*, 546 F. 3d at 1293; *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).

Plaintiff in this case contests Defendant's claim that CND is a subdivision of the Cherokee Nation entitled to the tribe's sovereign immunity. Plaintiff further advocates that the determination of whether or not CND is entitled to the tribe's sovereign immunity from suit should hinge on whether or not CND is properly considered an "arm of the tribe."

The "arm of the tribe" inquiry generally refers to a "subordinate economic entity" analysis used by at least one circuit court and multiple federal district courts to determine whether an entity is entitled to tribal sovereign immunity.[1] *See Bales v. Chickasaw Nation Industries*, 606 F. Supp.2d 1299, 1305 (D.N.M. 2009) (discussing the application of tribal sovereign immunity when an entity is a subordinate economic organization, i.e., an arm or division of, the tribe). While the Tenth Circuit has never explicitly applied a subordinate economic entity/arm of the tribe analysis in determining whether tribal sovereignty extends to a particular tribal commercial enterprise, it has cited with approval cases which have authority that has endorsed this analysis. *See Native American Distributing v. Seneca-*

---

[1] The "subordinate economic entity" analysis finds its roots in Arizona state law, well before the Supreme Court's decision in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.* It was designed to protect tribes' pursuit of economic affairs through subordinate governmental agencies without the fear they would unintentionally waive sovereign immunity. *See Johnson v. Harrah's Casino Corp.*, 2006 WL 463138, at *4 (W.D. Kan. Feb. 23, 2006).

*Cayuga Tobacco Co.,* 546 F.3d 1288, 1292, (10th Cir. 2008) (*citing Allen v. Gold Country Casino,* 464 F.3d 1044, 1047 (9th Cir. 2006) (holding that a casino that "function[ed] as an arm of the tribe enjoyed tribal immunity). District courts within the Tenth Circuit have also adopted the subordinate economic entity/arm of the tribe analysis. *See Bales,* 606 F. Supp.2d at 1306 (D.N.M. 2009); *Johnson v. Harrah's Casino Corp.*, 2006 WL 463138, at *4 (W.D. Kan. Feb. 23, 2006). Leading commentators have also recognized the subordinate economic entity/arm of the tribe analysis, for instance, Felix Cohen writes: "Although immunity extends to entities that are *arms of the tribes*, it apparently does not cover tribally chartered corporations that are completely independent of the tribe." F. Cohen, *Handbook of Federal Indian Law,* § 7.05(1)(a), p.636 (2005 ed.) (emphasis added). Given the seemingly broad support for this method of analysis, the Court accepts and now applies it to CND, the tribal entity in this case.

Although the subordinate economic entity analysis has been widely adopted, its implementation is rarely uniform. Most courts address one or more of the following factors in determining whether an entity is an arm of the tribe:

> (1) the announced purpose for which the entity was formed; (2) whether the entity was formed to manage or exploit specific tribal resources; (3) whether federal policy designed to protect Indian assets and tribal cultural autonomy is furthered by the extension of sovereign immunity to the entity; (4) whether the entity is organized under the tribe's laws or constitution rather than federal law; (5) whether the entity's purposes are similar to or serve those of the tribal government; (6) whether the entity's governing body is comprised mainly of tribal officials; (7) whether the tribe has legal title or ownership of property used by the entity; (8) whether tribal officials exercise control over the administration or accounting activities of the organization; (9) whether the tribe's governing body has power to dismiss members of the organization's governing body, and (10) whether the entity generates its own revenue,

whether a suit against the entity would impact the tribe's fiscal resources, and whether it may bind or obligate tribal funds.

*Johnson v. Harrah's Casino Corp.*, 2006 WL 463138, at *4 (W.D. Kan. Feb. 23, 2006). *See also id.* at *4, n.36 (noting differing subordinate economic entity analyses).

Many of these factors are clearly addressed in the plain language of the Cherokee Nation Legislative Act 37-05. *See* Def. Br., Ex. "B" at 2-4. In this 2005 act of the Cherokee Legislature, Cherokee Nation Businesses, Inc.("*CNB*"), a corporation wholly owned and regulated by the Cherokee Nation, was assigned ownership of multiple entities including CND, where Plaintiff was employed. *Id.* at 3 As a result of this legislative action, CND became a subsidiary of CNB under the Act. *Id.*

The Act shows that at the time CNB was established as a holding company for subsidiary entities like CND, it had multiple purposes, including promoting the Cherokee Nation's economic development and preserving and enhancing profits for redistribution throughout the Nation. *Id.* The language of the Act states that the reorganization of Cherokee properties, including CND, under the parent corporation CNB, was aimed at benefitting the tribe as a whole through the management and exploitation of business profits and other resources for the good of the tribe. *Id.* CNB was intended to control preexisting tribal corporations, including CND, in order to preserve and enhance those corporations as a source of income for the Cherokee Nation. *Id.* Under the control of CNB, Defendant CND's purpose was to act as a means of raising revenue for the Cherokee Nation. *Id.* Considering the importance of CND and similar entities as revenue sources for the tribe, extending the Tribe's sovereign immunity to CND would further federal policies aimed at protecting Indian

assets, and would also help preserve Cherokee cultural autonomy by protecting and encouraging the Cherokee Nation's continued efforts at economic self-sufficiency.

CNB was formally organized under the laws of the Cherokee Nation, and assumed control of tribally-owned entities, like CND, that were originally created under state law. *Id.* This allowed the Cherokee Nation to essentially re-incorporate these entities under tribal law, as most were created before tribal law addressed the incorporation of business entities. *See* Def. Br., Ex. "A" at 4, ¶ 9. Further, CNB's stated purposes, and thus CND's purposes, included the goals of "facilitat[ing] and promot[ing] the Nation's economic development through strategic planning, self-sufficiency, and a strong tribal government" and "preserv[ing] and enhanc[ing] profits and cash flow available for redistribution and investment, consistent with the policy and direction of the Cherokee Nation." Def. Br., Ex. "B" at 3. These stated goals reflect that the newly formed parent corporation was designed to manage the subsidiary entities, like CND, in a manner consistent with the goals of the Cherokee Nation.

Although there is no evidence as to whether CND's governing body is comprised mainly of tribal officials, Dennis McLemore, Secretary of CND, states that members of CND's board of directors are selected by the Principal Chief of the Cherokee Nation and confirmed by the Cherokee Nation Tribal Council. Def. Br., Ex. "A" at 3, ¶ 6. McLemore also attests to tribal oversight of CND's affairs, stating that any waiver of the sovereign immunity of the Cherokee Nation, CNB, or CND must be approved by a duly enacted resolution of the Cherokee tribal council and signed by the Principal Chief. *Id.* at 5, ¶ 13.

8

Although the record does not show that the Cherokee Nation holds title in its name to properties acquired by CND, the Court notes there is some tribal oversight of CND's property interests; CND cannot acquire real estate with a value in excess of six million dollars without the approval of the Tribal Council. *See* Def. Br., Ex. "B" at 4; Def. Br., Ex. "A" at 5, ¶ 11.

The Cherokee Nation also exercises control over the personnel and accounting decisions of CND. The Principal Chief may remove any or all of the managers of CND with or without cause. Def. Br., Ex. "A" at 3, ¶ 6. Additionally, the officials of CND must make monthly reports to the Cherokee Tribal Council using an accounting system adhering to generally accepted accounting principles. *Id.* at 4, ¶¶ 7-8. Finally, although CND appears to generate its own revenue, that revenue is for the benefit of the Cherokee Nation. *Id.* at 3, ¶ 5. Any suit or judgment against CND would negatively impact that revenue stream, a valuable tribal resource, and would ultimately bind or obligate tribal funds that would otherwise be available to the tribe.

Plaintiff does not explicitly argue that CND is not a commercial entity of the Cherokee Nation, but merely that CND does not perform self-governance functions. However, this claim ignores that the Supreme Court has drawn no distinction between the governmental and commercial activities of Indian tribes. *See Kiowa Tribe of Oklahoma v. Manufacturing Technologies Inc.*, 523 U.S. 751, 757-58 (1998).

Plaintiff's other argument, that a corporation wholly owned by a corporation wholly owned by the Cherokee Nation, doing business off the reservation, and employing non-

Indians, is too attenuated from the Cherokee Nation's interest in self-governance to benefit from tribal sovereign immunity, similarly fails. Aside from attacking CND's attenuated ownership structure, Plaintiff offers no evidence of ownership interests other than the Cherokee Nation or that CND is anything other than a tribal commercial enterprise. Further, such tribal commercial entities are entitled to tribal immunity regardless of where their activities take place, or the entities' degree of removal from the tasks of tribal self-governance. *See Kiowa*, 523 U.S. at 757-58 (1998) (holding tribes enjoy immunity from suit, whether involving governmental or commercial activities and whether on or off the reservation). Finally, Plaintiff offers no binding authority to support the contention that mere employment of non-Indians by a tribal commercial enterprise negatively impacts that entity's claim of tribal sovereign immunity.

IV. Conclusion

Upon application of the "arm of the tribe" rationale advocated by Plaintiff, CND meets most, if not all, of the criteria commonly used by courts in determining whether or not a tribal commercial enterprise is an "arm of the tribe." Further, the Supreme Court has drawn no distinction between the governmental and commercial activities of Indian tribes when applying the doctrine of tribal sovereign immunity. Thus, this Court cannot accept Plaintiff's argument that CND, a commercial enterprise of the Cherokee Nation, is too attenuated from Cherokee governmental interests to be protected by the sovereign immunity of the Cherokee Nation.

CND's tribal immunity as a commercial enterprise of the Cherokee Nation exists absent express abrogation by Congress or the explicit waiver of that immunity by the Cherokee Nation. As there is no evidence of either abrogation or waiver, CND is immune from Plaintiff's suit.

For the foregoing reasons, the Court finds that Defendants are entitled to rely on tribal sovereign immunity to defeat Plaintiff's action.[2]

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(1) [Doc. 38] is GRANTED.

IT IS SO ORDERED this 16th day of April, 2010.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

---

[2] The United States Supreme Court has commented thusly regarding perpetuation of the doctrine of tribal immunity:

> There are reasons to doubt the wisdom of perpetuating the doctrine. At one time, the doctrine of tribal immunity from suit might have been thought necessary to protect nascent tribal governments from encroachments by States. In our interdependent and mobile society, however, tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.

*Kiowa Tribe of Oklahoma* v. *Manufacturing Technologies, Inc.*, 523 U.S. 751, 758 (1998) (internal citations omitted). Nonetheless, the Supreme Court has deferred to Congress to comprehensively address the issue. *Id.* at 760.